**SANELE ALE, Plaintiff**

**v.**

**PETER E. REID STEVEDORING, INC., SIATU'U FA'ASIU and NATIONAL PACIFIC INSURANCE CO., LTD.,**
Defendants

High Court of American Samoa
Trial Division

CA No. 95-91

May 7, 1993

Before KRUSE, Chief Justice, TAUANU'U, Chief Associate Judge, and LOGOAI, Associate Judge.

Counsel: For Plaintiff, Robert A. Dennison III
 For Defendant, Aitofele T. Sunia

While working on the main government dock as a security officer for the Department of Port Administration, plaintiff Sanele Ale was struck by a pickup truck on December 19, 1989. The truck belonged to defendant Peter E. Reid Stevedoring, Inc., and it was driven at the time by the defendant Siatu'u Fa'asiu, an employee of the stevedoring company.

On the evidence, we find that plaintiff was struck while Fa'asiu was backing up the truck; that the truck was loaded high with empty pallets; that Fa'asiu had not seen the plaintiff when he backed up the vehicle; and that shortly after the collision Fa'asiu, who is now deceased, had told plaintiff's supervisor, Toia Toia Jr., that he was tired because he had worked around the clock. We also find that the collision occurred while Fa'asiu was working in the regular course of his employment with Peter E. Reid Stevedoring, Inc.

We conclude on the facts that the driver Fa'asiu was negligent in the operation of his vehicle. Among other things, he had the statutory duty not to back his vehicle "unless such movement could be made with safety." A.S.C.A. § 22.0324. He obviously failed to observe that duty. Furthermore, Peter E. Reid Stevedoring, Inc. is vicariously liable, under the doctrine of *respondeat superior*, for any damages arising as a result of the negligence of its employee Fa'asiu.

It was early evident that plaintiff had, as a result of the accident, sustained three fractured ribs on his left side and suffered lung contusion. There is no dispute here. However, the defendants do dispute that aspect of plaintiff's claim which relates to his complaints about debilitating weakness and sensory loss on his left side. While plaintiff claims that this condition of his was also a result of the accident, the defendants counter with the charge of malingering.

On this latter aspect of plaintiff's damages claim, the medical evidence, which largely consists of written reports by various physicians, is far from conclusive. Following the collision, plaintiff was seen at the

43

LBJ Tropical Medical Center's emergency clinic, where he complained about being struck by a motor vehicle. Although x-rays were apparently taken, radiology initially reported "no fractures," and plaintiff was sent home with analgesics. The following day, plaintiff returned to the hospital and complained about pains in the chest area and in his legs, although the attending physician observed his sitting cross-legged. He also reported that he was knocked out as a result of the collision and that he was coughing up blood in his sputum. Further examination revealed that plaintiff had three fractured ribs on his left side, and he was then referred to the hospital's surgical clinic, where he was seen by Dr. Te'ariki No'ovao on December 22, 1989. Dr. No'ovao's findings were "(a) [p]ost traumatic left base chest consolidation, with effusion, (b) fractured ribs, (3) left chest wall and lung contusion, (c) left shoulder arthralgia - with pain down left upper limb." Plaintiff was given antibiotics, cough medicine and analgesics, with directions on breathing exercises and to return for follow-up management.

In subsequent follow-up visits, plaintiff began to complain of weakness in his left arm and failing vision. In a letter to plaintiff's attorney, dated February 14, 1990, Dr. No'ovao noted that plaintiff's fractured ribs and contusion carried no permanent impairment but that while plaintiff's prognosis was "fair to good," the complaint of weakness in his left arm required further evaluation. In this regard, Dr. No'ovao noted "[l]eft upper limb paresis motor deficits at 2-3/5; the exact nature or pathology here is not determinable at this point in time." As to plaintiff's failing vision ailment, the hospital's ophthalmologist examined plaintiff on April 24, 1990, and noted "presbyopia" in his medical records.

On June 4, 1990, Dr. No'ovao wrote another letter to plaintiff's attorney reiterating his rating of plaintiff's left-hand grip to be "2-3/5 (5/5 being normal)." He also noted that the patient had expressed a desire for early retirement, which he was inclined to recommend on "medical grounds," based in part "on [left upper-limb] motor impairment" and in part on impaired left-eye vision attributed to age. Dr. No'ovao again noted that the exact pathology of plaintiff's weakness was not determined and suggested specialized off-island diagnostic studies--"CT scan and complete neurological evaluation"--to determine the causative factors leading to plaintiff's weakness.

Plaintiff's hospital records show that he was also seen on July 17, 1990, by Dr. Victor Williams, a visiting surgeon formerly with the hospital. The court was not supplied with Dr. Williams' actual report,

44

but his findings were reviewed and summarized by Dr. Robert Marvit of Honolulu, Hawaii, who also examined plaintiff and whose written report, dated November 6, 1991, was received into evidence. Reading from Dr. Marvit's review, Dr. Williams apparently "couldn't diagnose left sided-weakness without speculation about a mild stroke but there is no evidence of this. He felt that he would recover completely. He didn't feel that there were any permanent injuries as a result of this accident."

On August 10, 1990, plaintiff consulted Dr. Ronald Vinyard, another surgeon in the hospital's surgical clinic. In a letter to plaintiff's counsel dated October 1, 1990, Dr. Vinyard noted symptoms of left upper-limb motor and sensory deficiencies but at the same time concluded that no physical explanation existed for plaintiff's symptoms. Dr. Vinyard's impressions were a "conversion reaction (functional overlay)" with "poor prognosis for improvement." He recommended off-island assessment in the way of an "electromyographic study as well psychiatric evaluation."

Certain off-island examinations were eventually undertaken some twenty-two months following the automobile accident. These were funded by the insurer for workmen's compensation for the government (plaintiff's employer), pursuant to a provisional decision and order entered by the Workmen's Compensation Board on May 15, 1991. *See Ale v. American Samoa Government, Blue Shield and Oceania Insurance Company*, WCC No. 04-91 (1991) (Decision and Order Re Temporary Total Disability Benefits and Off-Island Medical Evaluation). This order resulted from an "informal hearing" convened on April 3, 1991. The order recited, among other things, the cessation of temporary total disability benefits as of October 26, 1990, and a stipulation by the parties to the effect that plaintiff's injuries had "stabilized on or about October 26, 1990." The order further stated that plaintiff was seeking the reinstatement of his temporary total disability benefits but that "the relation of [plaintiff's] impairment and/or disabilities to the injuries sustained from the motor vehicle accident on the dock is not clear."[1] The board denied the reinstatement of benefits but ordered off-island evaluation at the insurer's expense; this evaluation was to include "an

---

[1] *But cf.* A.S.C.A. § 32.0642 ("In any proceeding for the enforcement of a claim for compensation under [the Workmen's Compensation Act], it is presumed, in the absence of substantial evidence to the contrary, that [] the claim comes within the provisions of the [Act]").

45

electromyographic study, psychiatric evaluation and a neurological evaluation." Consequently, plaintiff was seen by three different physicians in Honolulu, Hawaii.[2]

In Honolulu, plaintiff was seen by Dr. Michael Okihiro neurologically. Dr. Okihiro found that plaintiff's reflexes were normal, that muscle testing showed "marked giving-way" in his left arm and left leg, and that sensory testing revealed complete sensory loss on his left side. With electromyographic (EMG) testing, Dr. Okihiro concluded that there were no "neurological correlates to [plaintiff's] signs and symptoms which may very well be on a functional basis."

On October 23, 1991, plaintiff was examined by Dr. Clyde Ishii who, in his report dated October 28, 1991, stated the following:

> My examination revealed findings that were inconsistent with the patient's complaints. The patient claimed to have significant weakness and almost a paralysis of the left upper extremity. However, he showed no muscle atrophy in the left upper extremity. In addition, muscle testing was very inconsistent. At times, a tested muscle group was very strong whereas on repeat examination it was very weak. Grip strength measurements were also very inconsistent. For instance, his grip strength on the left was measured at four pounds, one pound and twenty pounds.

Dr. Ishii concluded, "[I]t is possible that Mr. Ale is suffering from a conversion type of reaction following his trauma. Also, we need to be concerned about possible factitious illness." He recommended plaintiff's evaluation by Dr. Robert Marvit, who had treated a number of patients with similar complaints.

On October 30, 1991, Dr. Marvit examined plaintiff to evaluate the latter's complaints and to investigate whether there was a relationship between his "functional symptomatology" and the accident, among other things. Dr. Marvit dismissed as "practically nonexistent" the possibility

---

[2] The court was not provided with any background information on these physicians and their respective fields. However, they had each supplied a written report of their findings and conclusions to the government's workmen's compensation carrier.

46

of a head injury's being the cause of plaintiff's problems. Rather, neuropsychiatric examination "clearly" indicated to him "nonanatomical problems." Except for the possibility of pain to plaintiff's rib-cage area, Dr. Marvit saw plaintiff's symptoms as the product of his own perception of a disorder, as opposed to their being biomechanical in origin.

Although he noted that plaintiff's complaints manifested a "hysterical or conversion type pattern," Dr. Marvit was not able to say whether plaintiff's "symptom production" was voluntary or involuntary. He felt he needed objective data beyond plaintiff's subjective declarations, which he characterized as a combination of "honest, random, irrelevant and factitious." Additionally, he observed in plaintiff "dissimulation," which he described as "a distortion and misrepresentation of symptoms," and further noted that the "manifestations of [plaintiff's] complaints [were] utilized through an exaggerated expression." He felt that plaintiff's subjective responses were of "limited reliability." Consequently, Dr. Marvit only ventured a "differential diagnosis." He opined "factitious illness with Physical Symptoms, Dissimulation with Hysterical Conversion, and 'Post Traumatic Syndrome.'" He further explained "Post Traumatic Syndrome" as "basically a wastebasket term of functional symptoms that result from a sudden onset, life-threatening traumatic experience in an individual who becomes enmeshed in secondary gain problems where the disability far exceeds the biomechanical basis of any complaints."

Finally, plaintiff was most recently examined by the Dr. Aloimoa Anesi in connection with a referral from the government's retirement office. The latter was reviewing an application by plaintiff for early retirement. In a letter to the retirement office, dated January 10, 1991, Dr. Anesi recommended early retirement after concluding that plaintiff was not capable of any further "meaningful" work. He rated the power in plaintiff's left arm at 2/6 and that in his left leg at 3/6. From his assessment of plaintiff's medical history, Dr. Anesi additionally offered a physiological explanation for plaintiff's left-side complaints--he suggested "cerebral ischaemia" resulting from a cerebral concussion sustained in the accident, caused plaintiff's left "hemiparesis."

From the foregoing medical history, the possibilities are that plaintiff's symptoms are either the result of a physical injury or psychological trauma (conversion reaction), that plaintiff is malingering, or that some combination of the above factors are involved. On the side

47

of physical causation, we note that Dr. Anesi is singular in his opinion.[3] While it appears that both Drs. No'ovao and Williams were not ruling out the possibility of cerebral-related damage, it is clear that neither was willing to commit to such a diagnosis without further evidence. At the same time, Dr. Anesi's opinion assumes cerebral concussion from the accident as a matter of fact. However, concluding that a cerebral concussion resulted from the accident is not free of doubt.

Similarly, the smidgen of evidence available concerning the accident itself[4] is thoroughly conflicting. As noted, plaintiff reported that he was knocked unconscious by the impact. However, this claim is controverted by Ne'emia Tanielu, who testified that he was also working on the wharf on the day of the accident. Tanielu testified that after hearing a voice call out that somebody was hurt, he immediately ran to the scene, where he saw a very-conscious plaintiff sitting upright behind the pickup truck and reacting belligerently towards placating overtures from Fa'asiu.

Additionally, we note that the entries in plaintiff's hospital records of December 19, 1989, the day of the accident, conspicuously omit any notation about loss of consciousness (there is an entry of "Neuro: physiological"). *See* T.C.R.Ev. 803(7). It was only for the following day, when plaintiff went back to the hospital, that the medical records reflect a report about loss of consciousness. Based on the foregoing, we find the weight of medical opinion, indeterminate and ambiguous as it is, to preponderate in favor of a non-organic explanation to plaintiff's symptoms.

We turn to the question of causation. In this, we find the proofs to be insufficient to establish a causal link between the accident and plaintiff's complaints about weakness and sensory loss on his left side.

---

[3] This opinion is not without support. For instance, Dr. Williams alluded to the possibility of a mild stroke as a possible explanation but felt he was unable to say so without further evidence. Also, Dr. No'ovao seemed to be concerned with head trauma possibilities because he suggested an off-island CAT scan. (For reasons unknown, a CAT scan was not performed.)

[4] Nobody seems to have seen anything, and of the two people involved, plaintiff maintains that he was immediately knocked out, while the driver, Fa'asiu, has since died.

48

From the very outset, the different doctors consulted locally by plaintiff recognized the need for specialized, off-island, diagnostic evaluation. The off-island evaluation, however, failed to pin-down plaintiff's ailments, and the results thereof have not really enlightened us on the issue of cause-in-fact. In our review of the multiple medical reports which have been presented, the strongest reading of the medical evidence that may be given in favor of plaintiff is that his complaints about left-side deficiency *could* or *might* be related to the accident. However, this is insufficient. It is trite law that the burden of proof is on plaintiff, and the standard of proof to which he is held involves "probabilities." That is, plaintiff must furnish evidence which affords a reasonable basis for the conclusion that defendant's conduct was, more likely than not, the cause-in-fact of the injury; mere possibilities are not enough. *See* Prosser & Keeton on Torts, § 41, at 269 (5th ed. 1984); *see also* Annotation, *Expert Evidence As To Cause--Sufficiency*, 135 A.L.R. 516, 517 (1941 & Supp. 1986). Not only have the experts have failed to sort out the underlying cause or causes to plaintiff's ailments, but they have, in terms of actually identifying plaintiff's problems, merely alluded to alternative possibilities (factitious illness versus hysterical conversion, voluntary versus involuntary symptom production) or possible combinations of these possibilities.

Additionally, we are mindful

that where the issue [of causation] is one which lies wholly beyond the range of the experience or observation of the laymen and of which they can have no appreciable knowledge, courts and juries must of necessity depend upon and accept the undisputed testimony of reputable specialists, else there would be no substantial foundation upon which to rest a conclusion.

*Kramer Service, Inc. v. Wilkins*, 186 So. 627, 628 (Miss. 1939). Thus, in circumstances where a conclusion as to causation is not within common knowledge, the court will not attempt to reach such a conclusion when the experts have failed to provide a basis for such a conclusion. What caused or produced plaintiff's symptoms is unclear from the medical evidence for the simple reason that the experts did not believe that they had sufficient data before them to permit conclusions beyond the realm of possibilities. It goes without saying that it would be pure conjecture on our part to attempt a conclusion as to whether or not the accident had anything to do with plaintiff's left-side difficulties, given the

extent of the medical evidence. Under the circumstances, the law requires us to direct a verdict in favor of defendants with regard to the latter aspect of plaintiff's damages claim.

On the undisputed aspect of plaintiff's claim, we assess his damages, inclusive of medical expenses, in the sum of $25,000 and enter judgment against the defendants accordingly.

It is so ordered.